IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | Criminal No. 2:16-CR-070-D |
| | § | |
| RUSSELL TIM SHEN (1) and | § | |
| ANDRE JORGE HERNANDEZ (2), | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

Defendants Russell Tim Shen ("Shen") and Andre Jorge Hernandez ("Hernandez")—who are charged with the offenses of conspiracy to distribute and possess with intent to distribute marihuana, in violation of 21 U.S.C. § 846, and distribution and possession with intent to distribute marihuana, and aiding and abetting, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(D), and 18 U.S.C. § 2—move to suppress all evidence, including 71 gross pounds of alleged marihuana, seized in connection with the stop of a vehicle that Shen was driving and in which Hernandez was a passenger, and all statements made by them at or after their arrest. Following an evidentiary hearing, and for the reasons that follow,[1] the court denies the motions.

---

[1]Pursuant to Fed. R. Crim. P. 12(d), the court sets forth in this memorandum opinion and order its essential findings.

On March 15, 2014 Coy Teichelman ("Officer Teichelman"), then employed as a police officer by the Childress, Texas Police Department, was patrolling U.S. Highway 287 in Childress, Texas. Highway 287 is a known drug-trafficking corridor. Officer Teichelman had been employed as a Childress police officer since graduating from the police academy in September 2007. In approximately 2010 or 2011, he began doing drug interdiction work. On the date of the stop, Officer Teichelman was operating a canine unit with his canine, Alis.

Officer Teichelman's work as a patrol officer enabled him to observe how people normally react during traffic stops as opposed to how those involved in criminal conduct react. Through training, he learned about normal and abnormal body language. Officer Teichelman had also had experience riding with state troopers and prosecutors, and he had done some teaching. Prior to the stop in this case, he had made between 50 and 60 highway traffic stops that resulted in felony drug seizures.

Officer Teichelman got Alis in 2011, and he had been working with her for approximately two years at the time of this stop. Alis received her initial training from Worldwide Canine, Inc., including two weeks of training with Officer Teichelman specifically. Alis was certified by the National Narcotic Detector Dog Association and the National Police Canine Association. Officer Teichelman and Alis also completed periodic training twice per month, and an annual certification once per year. The annual certification included a performance detection test that required Alis to locate drugs under "single blind" controls (i.e., the drugs' location was unknown to her handler). Alis completed an annual

certification just over one week before the March 15, 2014 traffic stop, and successfully completed her next annual certification after this traffic stop. One of the drugs on which she was certified was marihuana.

Alis was "passive" when she alerted. In contrast to an "aggressive" canine, Alis would sit, stand, or stare when she detected the presence of narcotics. She would initially show interest, short of a final alert, by wagging her tail, increasing her breathing, and staring or looking at a drug area. Officer Teichelman's procedure was to take Alis on an initial pass where she would get a general whiff, after which he would go back to detail a room or vehicle, focusing at that point on door seams or any areas where there was an odor. Alis did not like water, baths, and the like.

On the afternoon of March 15, 2014, Officer Teichelman observed an eastbound passenger car following a semi truck and trailer. It had been raining heavily earlier in the day, and the rain had stopped about five minutes beforehand. After noting that the car was closely following the semi, Officer Teichelman started following the car. He was concerned that, due to the heavy rain and the close distance between the two vehicles, if the semi slowed down, the car would be unable to avoid rear-ending the semi. Officer Teichelman initiated a traffic stop on the basis that the car was following the semi too closely.

Officer Teichelman's unit was equipped with a video camera, and he wore a microphone on his uniform. Both were activated when he turned on his unit's overhead lights. The recording of the video and audio was admitted in evidence and played during the suppression hearing.

After effecting the stop, Officer Teichelman notified dispatch by radio that he was making a stop, and he gave dispatch the car's license plate. He did this so that dispatch could run the vehicle's plates, or, if necessary, identify the stopped vehicle later. Officer Teichelman then approached the car, in which Shen was the driver and Hernandez was the passenger.

Officer Teichelman informed Shen of his name and department and advised Shen that he had stopped him for following the semi too closely. Shen responded that he was intentionally closely following the semi so that water kicked back from the semi would wash his windshield, and that he had planned to fall back after his windshield was clean.

Officer Teichelman informed Shen that he was going to write a warning. He then asked Shen for his driver license, which is part of his routine procedure when making a traffic stop. Officer Teichelman asked Shen if the car belonged to him, and Shen responded that it was a rental. Officer Teichelman then asked Shen, as he routinely does in the case of a rented car, whether he had a copy of the rental agreement, and Shen said that he did.

Shen was acting very nervously. He hands were very shaky as he thumbed through his paperwork. Instead of providing Officer Teichelman a copy of the rental agreement, Shen actually provided him an XM satellite radio channel menu. Officer Teichelman then informed Shen that he was issuing a warning. He usually does this early in a traffic stop to calm the driver's nerves.

Officer Teichelman asked Shen to join him in his patrol car. He asked Shen whether he had any weapons—a question that he asks for his own safety. Shen responded that he was

not carrying a weapon, and he identified himself as a federal officer.

Inside the patrol car, Officer Teichelman reviewed the rental agreement and noticed that it was in Hernandez's name and for a one-way trip  According to Officer Teichelman, one-way rentals are relatively expensive, and drug traffickers generally are not price-sensitive when traveling.  Officer Teichelman asked Shen where he had come from, and Shen responded that they had come from Denver.  When Officer Teichelman asked Shen what was going on in Denver,  Shen oddly responded by shaking his head and stating,  "Not even gonna bother with that," and "I can't deal with it."  Shen showed Officer Teichelman a federal ID and badge that identified Shen as a federal officer with Homeland Security and Border Protection.  Shen repeated, "I can't deal with it."  When Officer Teichelman asked Shen what he meant by that, Shen replied, "I'm supposed to pick up this stuff.  That's what I do in Miami."

Officer Teichelman honestly believed at this point that Shen was on duty as part of a contraband delivery or was working as an informant.  He thought that Shen's reference to "stuff" might mean that there was something illegal in the vehicle.  Officer Teichelman then asked Shen if the car's passenger was with him, and Shen said "yeah."  Officer Teichelman asked if the passenger was also a law enforcement officer, and Shen said "no."  Officer Teichelman was trying to go through a process of elimination to find out what Shen was doing.

Officer Teichelman then asked Shen whether they were in Denver for business, and Shen said, "no, it was just pleasure."  Shen said that they were going to stop in Houston.

When Officer Teichelman asked how long they planned to stay in Houston, Shen shook his head and said "probably overnight." Officer Teichelman had noticed from the rental agreement that it was a one-way rental to Florida, and believed that they had paid about $1,800 for the rental. It would cost them even more to stay one night in Houston before traveling to Florida. The stop was made on March 15, 2014, it was a nine-hour drive to Houston, and the car was due back in Florida on March 17, 2014. In Officer Teichelman's experience, he often saw persons involved in drug trafficking who were not concerned with the cost of a rental vehicle.

Officer Teichelman then exited his patrol car and went to talk to Hernandez. He asked Hernandez if he had rented the vehicle, to which Hernandez answered "yes," and asked Hernandez where they were coming from and where they were going. Hernandez said they had come from Colorado, where they had visited Shen's friends in Denver, and were driving to Houston to visit Shen's friends. Hernandez stated that they had been in Denver so that Shen could undergo chemotherapy. Officer Teichelman then returned Hernandez's driver license. Hernandez appeared nervous during this exchange with Officer Teichelman. Hernandez also said that he and Shen had been on a short trip. In Officer Teichelman's training and experience, short trips over long distances were associated with criminal conduct.

Officer Teichelman talked to Hernandez about the trip to compare Shen's and Hernandez's stories. This is a tactic that he used. Hernandez had said they were in Denver so that Shen could undergo chemotherapy; Shen, however, had said they were in Denver for

pleasure, and had said nothing about chemotherapy. It also seemed odd to Officer Teichelman that this was more or less Shen's trip, but Hernandez had rented the car in his name, but Shen had possession of the rental agreement in his vest.

Officer Teichelman then returned to his patrol car and gave Shen his driver license. Officer Teichelman's unit was not equipped with a computer, so it was necessary for him to run Shen's driver license with dispatch and write out the warning by hand. The stop had lasted about nine minutes at the time Officer Teichelman provided dispatch Shen's driver license. Officer Teichelman engaged in general conversation with Shen while writing out the warning. He was attempting, as an investigative tactic, to get details of Shen and Hernandez's trip. When Shen was discussing his trip, he appeared to be nervous and gave answers that were short, quick, and to the point. But when discussing other topics, such as the weather, Shen's body appeared to be more at ease. Officer Teichelman returned Shen's driver license to him and gave him a copy of the warning.

About 10 minutes had elapsed from the time Officer Teichelman effected the traffic stop. On average, Officer Teichelman's traffic stops are 8 to 12 minutes, depending on factors such as the driver's behavior and how busy the dispatcher is when responding to information radioed in.

As of the time Officer Teichelman handed Shen the warning, based on talking to Shen and Hernandez, he had developed reasonable suspicion, based on the following combination of factors, that there was something illegal in the vehicle: (1) Shen and Hernandez were driving a rental vehicle under a one-way rental agreement; (2) they paid more than $1,800

for the rental; (3) they did not care if the rental car was returned late; (4) they had flown to Colorado and were now driving a rental car on their return trip, and it is more expensive to drive a rental car at this cost than to fly; (5) it was essentially Shen's trip, but the car was rented in Hernandez's name; (6) they were making a questionable quick stop in Houston before traveling to Florida; and (7) Shen identified himself as a federal officer and stated that he was picking "stuff" up, but Officer Teichelman had worked with the DEA and had done controlled deliveries, and there were always multiple officers around when he did them.

With the warning issued and the stop's original purpose completed, Officer Teichelman told Shen that Hernandez was acting nervously and asked Shen whether there was anything illegal in the vehicle. Shen responded negatively by shaking his head from side to side and giving a one-syllable answer. Officer Teichelman then asked Shen for his consent to look inside the car. Shen responded, "I'd prefer you wouldn't." Officer Teichelman informed Shen that Shen had the right to deny consent but that he intended to run his canine around the car. He also explained to Shen that if the canine alerted on the car, he would have probable cause to search it.

Officer Teichelman retrieved his drug detection canine, Alis, from the back of his canine unit. He and Alis approached defendants' vehicle for a quick pass to get a sniff of air. At the front of the vehicle, Officer Teichelman signaled to Alis to search down low (to get the bottom door seams) and then high (to get the door and window seams). During this pass, Alis jumped up on the driver side window, and stuck her head inside the open window. Alis showed signs of interest, such as through an increased breathing rate, wagging tail, and

sniffing more air through her nose.

Officer Teichelman and Alis then walked on the driver side to the rear of the vehicle where Alis sniffed the trunk seam, and then on the passenger side, where Alis paused, sniffed, and quickly stared at the passenger door seam for about one second.

Officer Teichelman decided that Alis had shown odor response to the vehicle, which would give him probable cause to search it. Alis' method of communicating a "final alert" was to sit, and she did not come to a full sit on this occasion. According to Officer Teichelman, she did not come to a full sit because she hated water, the vehicle was parked in a puddle of water, and she would not come to a full sit in water.

Officer Teichelman informed Shen that the dog had shown odor response and that he was going to search the car. Approximately 14 minutes had elapsed since Officer Teichelman stopped the car, and approximately four minutes had elapsed since he gave Shen the written warning. Officer Teichelman, assisted by two other uniformed police officers, searched the vehicle. In the trunk, they found black duffel bags containing what was later alleged to be marihuana. They arrested Shen and Hernandez and gave *Miranda* warnings to them.

Officer Teichelman testified that, although drugs were found in the trunk, it is not uncommon for a canine to alert in areas other than the trunk due to the effects of wind, traffic, and air flow near a highway that can carry odors away from the trunk. And although Alis had alerted before on a location where no drugs were later found, Officer Teichelman testified that, in each instance, an officer also noticed the smell of narcotics.

On cross-examination, Officer Teichelman acknowledged that, as a dog handler, not a dog trainer, he was not qualified to change Alis' method of alerting. He also admitted that Alis' alert method was to sit, that she was trained to alert this way in various weather conditions, and that she did not sit on the passenger side of the vehicle, although there was a small pause on the front of the vehicle.

At the suppression hearing, defendants offered the testimony of Steven Nicely ("Nicely") as an expert on canine behavioral science and on the free air sniff that Officer Teichelman conducted using Alis. Nicely opined that the execution of the walkaround was terrible, and the video of the stop did not show that Alis had alerted. He testified that a proper canine search must rely on trained behavior that is "nonreflexive," such as sitting; that "reflexive" behaviors, such as the excitement or sniffing, cannot be trusted, because it is impossible in an uncontrolled environment to eliminate alternative stimuli that might cause these reactions; and that a handler should not change a canine's method of alerting, because the handler himself is not trained for this, and it introduces too many variables for the canine to reliably understand. Nicely also suggested that Officer Teichelman's actions, perhaps including reaching his hand into or near the car window, may have improperly cued Alis to exhibit excitement.

On cross-examination, Nicely testified that he had appeared in court as an expert witness approximately 118 times; that some courts have criticized his opinions because he imposes a high standard on dog handlers; and that his opinion in this case was based on reviewing the video recording, Alis and Teichelman's training records, and material related

to a training manual.

Shen and Hernandez each move to suppress and preclude the government from introducing as evidence at trial the contraband seized during the traffic stop, and all evidence and statements obtained in connection with this search and seizure. The government opposes the motions.

II

The Fourth Amendment protects individuals against unreasonable searches and seizures. "The stopping of a vehicle and detention of its occupants constitutes a 'seizure' under the Fourth Amendment." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004). Evidence derived from an unreasonable search or seizure generally must be suppressed under the "fruit-of-the-poisonous-tree doctrine." *United States v. Alvarado-Zarza*, 782 F.3d 246, 249 (5th Cir. 2015) (citing *United States v. Cotton*, 722 F.3d 271, 278 (5th Cir. 2013)). "Warrantless seizures are 'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Id.* (quoting *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014)). One such exception comes from *Terry v. Ohio*, 392 U.S. 1 (1968).

The framework articulated in *Terry* is used to analyze the legality of a traffic stop. "Under the two-part *Terry* reasonable suspicion inquiry, [the court asks] whether the officer's action was: (1) 'justified at its inception'; and (2) 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry*, 392 U.S. at 19-20). "A

temporary, warrantless detention of an individual constitutes a seizure for Fourth Amendment purposes and must be justified by reasonable suspicion that criminal activity has taken or is currently taking place; otherwise, evidence obtained through such a detention may be excluded." *United States v. Garza*, 727 F.3d 436, 440 (5th Cir. 2013). "Reasonable suspicion requires more than merely an unparticularized hunch, but considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.* (internal quotation marks and citation omitted). As this court has previously explained:

> For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. The Supreme Court has stated that in making a reasonable suspicion inquiry, a court must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing. We have stated previously that reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure. In evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from each other. In scrutinizing the officer's basis for suspecting wrongdoing, it is clear that the officer's mere hunch will not suffice. It is also clear, however, that reasonable suspicion need not rise to the level of probable cause.

*United States v. Johnson*, 2006 WL 1041148, at *3 (N.D. Tex. Apr. 20, 2006) (Fitzwater, J.) (quoting *Lopez-Moreno*, 420 F.3d at 430).

Although "[a] defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional[,] . . . where a police officer acts without a warrant, the government bears the burden of proving that the search

was valid." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citations omitted).

Accordingly, "[t]he government bears the burden of establishing by a preponderance of the evidence [the] two elements under Terry[.]" *Johnson*, 2006 WL 1041148, at *3 (citing *United States v. Sanchez-Pena*, 336 F.3d 431, 437 (5th Cir. 2003); *United States v. Riley*, 968 F.2d 422, 424-25 (5th Cir. 1992)).

III

Relying on the second prong of *Terry*, Shen and Hernandez contend that their motion to suppress must be granted because the stop was unreasonably prolonged in relation to its initial justification. Citing *Rodriguez v. United States*, ___ U.S. ___, 135 S.Ct. 1609 (2015), they essentially maintain that Officer Teichelman could have issued a warning within one minute after effecting the traffic stop, and that he was not permitted to delay running Shen's driver license and writing the warning for ten minutes while he asked probing questions.

A

Under the second prong of *Terry*, the court asks whether Officer Teichelman's actions after stopping defendants' vehicle "were reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop." *Brigham*, 382 F.3d at 507. "An officer's subsequent actions are not reasonably related in scope to the circumstances that caused him to stop the vehicle if he detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless he develops reasonable suspicion of additional criminal activity in the meantime." *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010), *modified on other grounds*, 622 F.3d 383 (5th Cir. 2010); *see also*

*United States v. Spears*, 636 Fed. Appx. 893, 901 (5th Cir. 2016) ("The time reasonably required to complete the mission of issuing a traffic ticket can include the time it takes to inspect the driver's license, automobile registration, and proof of automobile insurance; run computer checks; determine whether there are outstanding warrants against the driver; and ask the purpose and itinerary of the trip." (citing *Rodriguez*, 135 S.Ct. at 1615; *Pack*, 612 F.3d at 350)). If, however, "the officer develops reasonable suspicion of additional criminal activity, . . . he may further detain [the] occupants [of the vehicle] for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *United States v. Andres*, 703 F.3d 828, 833 (5th Cir. 2013) (alterations in original) (quoting *Pack*, 612 F.3d at 350). "Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the search and seizure." *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006). "The determination . . . must be made based on the totality of the circumstances and the collective knowledge and experience of the officer[s]." *Id.* at 631-32 (citation omitted).

B

Defendants do not dispute that Officer Teichelman had an initial justification to stop their vehicle based on the observed traffic offense of following too closely. Instead, they contend that the stop was unlawfully prolonged because Officer Teichelman could have written the warning in less that one minute, and that he unjustifiably prolonged the stop by waiting to run Shen's driver license and issue the warning while he asked probing questions of Shen and Hernandez. Although defendants did not emphasize the following argument in

closing at the suppression hearing, they maintain in their motions that Officer Teichelman detained them without reasonable suspicion for the additional four minutes he needed to complete the free-air sniff with his canine. *See Rodriguez*, 135 S. Ct. at 1616 (holding that reasonable suspicion is required to justify prolonging a traffic stop to conduct a dog sniff).

The government responds that the stop was not unreasonably prolonged in relation to the circumstances that justified it. It maintains that checking defendants' driver licenses and the rental car agreement, and asking questions about defendants' itinerary, were permissible inquiries that did not measurably extend the stop. *See Rodriguez*, 135 S.Ct. at 1615; *Brigham*, 382 F.3d at 508. The government also contends that, by the time Officer Teichelman gave Shen the written warning and completed the original mission of the traffic stop, Officer Teichelman had developed reasonable suspicion to detain the defendants for the few additional minutes that it took to conduct the dog sniff.

### C

The government proved by a preponderance of the evidence that Officer Teichelman did not unlawfully prolong the initial phase of the traffic stop. After effecting the stop based on an observed violation of Tex. Transp. Code Ann. § 545.062(a), Officer Teichelman was permitted to prolong the stop for the time it took to ask Shen for his driver license or rental agreement, *see Rodriguez*, 135 S. Ct. at 1615 (citing *Delaware v. Prouse*, 440 U.S. 648, 658-660 (1979)); *Brigham*, 382 F.3d at 508, and to ask dispatch to run the vehicle's license plates, *see Brigham*, 382 F.3d at 509. Officer Teichelman was also permitted to ask Shen and Hernandez about their travel itinerary. *See Brigham*, 382 F.3d at 508 (holding that officer

- 15 -

may ask about travel itinerary).  And if, during this questioning, he developed reasonable suspicion that other criminal activity was afoot, he was permitted to further detain Shen and Hernandez for a reasonable time while appropriately attempting to dispel this reasonable suspicion.  *See Andres*, 703 F.3d at 833.

Almost immediately after requesting Shen's driver license and the rental agreement, Officer Teichelman began developing reasonable suspicion that Shen and Hernandez were engaged in other criminal conduct.  Shen acted very nervously when providing the rental car agreement to Officer Teichelman.  His hands were very shaky as he thumbed through his paperwork.  And instead of providing Officer Teichelman a copy of the rental agreement, Shen provided him an XM satellite radio channel menu.  Officer Teichelman noted that the rental agreement was in Hernandez's name and for a one-way trip.  According to Officer Teichelman, one-way rentals are relatively expensive, and drug traffickers generally are not price-sensitive when traveling.  And after Officer Teichelman learned that Shen and Hernandez had been in Denver and asked Shen what was going on there, Shen responded oddly by shaking his head and stating,  "Not even gonna bother with that," and "I can't deal with it"; he showed Officer Teichelman a federal ID and badge that identified himself as a federal officer with Homeland Security and Border Protection; Shen repeated, "I can't deal with it"; and Shen stated, "I'm supposed to pick up this stuff.  That's what I do in Miami." Although Officer Teichelman's further questioning of Shen and Hernandez extended the stop by a few minutes beyond what was required to check Shen's driver license and the rental agreement, it was constitutionally permissible because Officer Teichelman was appropriately

attempting to dispel his reasonable suspicion by diligently pursuing a means of investigation that was likely to confirm or dispel his suspicions quickly. *See Andres*, 703 F.3d at 833; *Brigham*, 382 F.3d at 511.

Officer Teichelman's decision to detain Shen and Hernandez for the few additional minutes required to conduct the canine free-air sniff was also constitutional because it was supported by reasonable suspicion. *See, e.g., Pack*, 612 F.3d at 362 (holding that car occupants' extreme nervousness, inconsistent stories, and location of stop on drug trafficking corridor were sufficient to support reasonable suspicion).

## IV

Defendants next contend that Officer Teichelman did not have probable cause to search their vehicle because his canine, Alis, did not alert to the presence of narcotics.

## A

"[W]arrantless searches of automobiles are permitted by the Fourth Amendment if supported by probable cause." *United States v. Seals*, 987 F.2d 1102, 1107 (5th Cir. 1993). "[A]n alert by a drug-detecting dog provides probable cause to search" a vehicle. *Sanchez-Pena*, 336 F.3d at 444. When a defendant challenges "the reliability of the dog overall or of a particular alert," then "[t]he question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Florida v. Harris*, ___ U.S. ___, 133 S. Ct. 1050, 1058 (2013).

B

Defendants contend that Alis did not alert on their vehicle and that Officer Teichelman therefore did not have probable cause to search the vehicle. They emphasize, and the government does not dispute, that Alis did not squat or sit at any time. And defendants contend that Alis' behavior does not amount to a response that a reasonably prudent person would consider to be an alert on the car. *See id.* Defendants support this contention with Nicely's testimony that any canine behavior other than a trained nonreflexive response—in this case, to sit—cannot be relied on. Defendants also suggest that Officer Teichelman may have cued Alis to become excited by reaching his hand into or near the vehicle's window. They also contend, based on the video, that Alis does not perceptibly delay on the passenger side of the vehicle, where the government contends that he paused and stared.

The government responds that Alis' behavior was sufficient to give Officer Teichelman probable cause to search defendants' vehicle. It posits that Alis had completed initial certifications, annual certifications with blind testing, and continuing training, all with reliable performance; that the behavior of Alis that Officer Teichelman observed—an increased breathing rate, sniffing more air through her nose, and pausing and staring—were sufficient to make a reasonably prudent person think that she had detected the odor of narcotics; and that the Fifth Circuit, in an unpublished decision, and at least one other circuit have held that a dog is not required to come to "final alert" to establish probable cause, *see United States v. Clayton*, 374 Fed. Appx. 497, 502 (5th Cir. 2010) (per curiam); *United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009).

The government proved that Alis' behavior was sufficient to establish probable cause to search defendants' vehicle. This is so because the government established that, viewed through the lens of common sense, the excited behavior that Alis exhibited during the free-air sniff, in combination with Alis' and Officer Teichelman's training and experience, would have made a reasonably prudent person think that a search would reveal contraband or evidence of a crime. *See Harris*, 133 S. Ct. at 1058.

Officer Teichelman had been working with Alis for approximately two years at the time of this stop. Alis was certified by the National Narcotic Detector Dog Association and the National Police Canine Association. Officer Teichelman and Alis completed periodic training twice per month, and an annual certification once per year. The annual certification included a performance detection test that required Alis to locate drugs under "single blind" controls. Alis had completed an annual certification just over one week before the March 15, 2014 traffic stop, and successfully completed her next annual certification after this traffic stop. One of the drugs on which she was certified was marihuana.

Alis' annual certification, with blind testing, establishes that she reliably detected drugs in a controlled environment. And according to Officer Teichelman's uncontradicted testimony, every case of a false positive response by Alis in the field was explained by the presence of recognizable narcotics odors, even if no drugs were ultimately found. *See id.* at 1056 (explaining that false positives are sometimes due to drugs that are well hidden or present in quantities too small to locate, or to residual odors from drugs that have since been

removed).

Further, the court finds that Officer Teichelman did not improperly cue Alis to respond. Although the video shows that Officer Teichelman reached his hand into or near the *driver*-side window during a pass, this gesture appears to be part of the series of high and low passes that he described as his procedure, and defendants have failed to demonstrate that this gesture in particular would have improperly cued Alis. And the video does not contradict Officer Teichelman's testimony that Alis paused on the *passenger* side of the vehicle. Alis is below the video frame when on that side, and it is not possible from viewing Officer Teichelman's upper body in the frame to confirm or refute that Alis paused.

Nicely's opinion that a canine must come to "full alert" would impose a higher burden than the law requires. The Fifth Circuit has not held in binding precedent that a full alert is required. And an unpublished, and therefore persuasive, opinion of the Fifth Circuit holds that a "full alert" is *not* required to establish probable cause. *See Clayton*, 374 Fed. Appx. at 502 ("So long as officers are able to articulate specific, reasonable examples of the dog's behavior that signaled the presence of illegal narcotics, this Court will not engage itself in the evaluation of whether that dog should have used alternative means to indicate the presence of the drugs."); *see also Harris*, 133 S. Ct. at 1058 ("The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime.").

The court therefore holds that the police had probable cause based on the canine's

free-air sniff to search defendants' vehicle.

V

Defendants also contend that any statements they made during or after their arrest must be suppressed as products of an illegal arrest. *See, e.g.*, *Dunaway v. New York*, 442 U.S. 200, 218 (1979). Because the government has established that the stop and search of their vehicle were lawful, the court denies this ground of defendants' motion.

*   *   *

Accordingly, the court denies defendants' motions to suppress.

**SO ORDERED**.

June 1, 2017.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE